UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| **CHABAD OF PROSPECT, INC.,** | **PLAINTIFF** |
| v. | No. 3:20-cv-737-BJB |
| **LOUISVILLE METRO BOARD OF ZONING ADJUSTMENT,** | **DEFENDANT** |

### OPINION & ORDER

Chabad of Prospect is a synagogue seeking to hold religious services in a residentially zoned neighborhood. But a local ordinance prohibits religious buildings in the neighborhood. Chabad decided to seek an exemption (a "Conditional Use Permit") from the Louisville Metro Board of Zoning Adjustment to continue serving the Jewish community in and around Louisville's East End. After a hearing, however, the Board denied the permit due to concerns about traffic, parking, property values, and the neighborhood's character. Chabad appealed to the Jefferson Circuit Court, but the court dismissed the case for lack of jurisdiction.

Rather than refile, Chabad sued the Board in federal court seeking damages, an injunction, and declaratory relief for violations of federal and state law. Chabad alleges that the Board's denial substantially burdened the synagogue's religious exercise and treated it unequally in violation of the Constitution's Free Exercise and Establishment Clauses, as well as several other federal statutes and state laws: the substantial-burden and equal-terms sections of the Religious Land Use and Institutionalized Persons Act, Kentucky's Religious Freedom Restoration Act, and Sections 1 and 5 of Kentucky's Bill of Rights. The Board moved to dismiss based on a similarly lengthy list of arguments: claim splitting, state immunity, untimeliness, failure to state a claim under RLUIPA, immunity under state law, and exclusive state remedies.

Chabad didn't split its claims and state immunity doesn't shield the Board. But § 1983's statute of limitations has run, Chabad failed to state a RLUIPA claim, and state law prevents Chabad from receiving the declaratory judgment it requests. So the Court grants the Board's Motion to Dismiss (DN 12).

### I. Allegations

In October 2016 Kentucky placed the historic Roswell Mansion up for auction. Complaint (DN 1) ¶ 24. Rabbi Boruch Susman asked the Kentucky Transportation Cabinet about permitted uses of the property. ¶ 26. He and his wife considered using

1

the property as both a residence and a synagogue. ¶ 32. At the time, the property was zoned for R4 residential use, which one state and one city official told Rabbi Susman would allow for religious uses. ¶¶ 27–28. The property was put up for auction again in October 2017. ¶ 29. In the interim, however, the City enacted a local ordinance that removed religious uses from the R4 zone, ¶ 30, although it authorized the Board to issue permits exempting private institutions from that restriction if they received a Conditional Use Permit and complied with parking, traffic, noise, and hours requirements, *see* Ordinance 132 (DN 12-4) at 4. Rabbi Susman bid on the property and the City approved his bid (the only one it received) in 2018. Compl. ¶¶ 31–35. At the time, Rabbi Susman was unaware that the ordinance had changed. ¶ 35. He organized a synagogue at the location under the name of Chabad of Prospect. ¶¶ 36–42.

But the government told Chabad to cease all activities and apply for a Conditional Use Permit, which the synagogue did. ¶¶ 43–44. The Board denied that permit after a hearing held on September 13, 2019. ¶ 111. Members of the Board and counsel for area residents voiced concerns about traffic and heard testimony from residents concerned the synagogue would diminish their property values and the character of the neighborhood. ¶¶ 72–72, 80–89, 95–96, 99.

Chabad rejected all these concerns: the congregation was small, traffic fluctuated for all sorts of reasons, secular gatherings could cause similar issues, and evidence showed Chabad hadn't harmed recent residential sales. ¶¶ 49–62, 70, 81–88. According to Chabad, the Board played favorites at the hearing, giving the opposition more time, allowing cumulative evidence, and showing "disdain" for Chabad and favor to the "'*real* property owners' of the neighborhood," pun apparently intended. ¶¶ 73, 97–103, 116 (emphasis added). Moreover, the Board highlighted sewage and groundwater concerns despite an expert from the Louisville Water Company who testified that the synagogue could resolve or mitigate any issues caused by converting the property from residential to mixed use. ¶¶ 68, 107–109. Ultimately, the Board denied the permit. ¶ 111. Chabad appealed the Board's denial—to the Board itself, apparently in a proceeding akin to a request for reconsideration. There the Board made clear that it would deny the permit regardless of proposed revisions to the application. ¶¶ 113–116.

So Chabad filed an appeal in state circuit court under KRS § 100.347(2). State Court Order (DN 12-3) at 4–5. But the court dismissed the appeal for lack of jurisdiction due to a filing error. *Id.* at 5. Rather than refile or appeal the state court's ruling, Chabad filed a complaint in federal district court alleging various violations of state and federal law. Its complaint alleges violations of RLUIPA, the Free Exercise and Establishment Clauses of the First Amendment, the Kentucky Religious Freedom Restoration Act, and Sections 1 and 5 of Kentucky's Bill of Rights. Compl. ¶¶ 1–9

The Board moved to dismiss, arguing that: (1) Chabad is claim-splitting; (2) the statute of limitations has run for any § 1983 cause of action; (3) state sovereign immunity bars any federal claims; (4) sovereign immunity bars any state claims, whose remedies are limited in any event; and (5) Chabad fails to state a claim under RLUIPA. Motion to Dismiss (DN 12).[1]

## II. Analysis

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While courts must accept factual allegations as true, courts need not accept "legal conclusions." *Id.* A claim's legal requirements provide an important framework for a complaint, but a "formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 570. A claim is plausible only if the complaint contains factual allegations supporting each of its "material elements." *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009).

### A. Chabad is not claim-splitting

Res judicata, also known as claim preclusion, serves the interests of finality and judicial economy by preventing relitigation. Establishing the defense requires showing: "(1) a final judgment on the merits in a prior action; (2) a subsequent suit between the same parties or their privies; (3) an issue in the second lawsuit that should have been raised in the first, and (4) that the claims in both lawsuits arise from the same transaction." *Wheeler v. Dayton Police Dep't*, 807 F.3d 764, 766 (6th Cir. 2015) (quotations omitted). When a subsequent claim is precluded, the case is dismissed and can be reviewed de novo on appeal. *Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011).

A related doctrine is claim-splitting, which also reflects "the general principle [of] avoid[ing] duplicative litigation." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976). Claim-splitting allows a court to dismiss or stay a proceeding that is "duplicative of another federal court suit." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138–39 (2d Cir. 2000). This doctrine arises from a court's "inherent discretionary authority to manage its own docket" and is therefore reviewed for abuse of discretion. *Katz*, 655 F.3d at 1218. Claim-splitting is essentially the same as res judicata except it depends on "a presumption of a final judgment instead of an actual final judgment." *Waad v. Farmers Ins. Exch.*, 762 F.

---

[1] Chabad's complaint requests a preliminary injunction. And the parties argue over whether it should be granted. MTD at 15. But Chabad never moved for a preliminary injunction, nor has it provided evidence to justify one at this stage. So the Court will not consider such relief.

App'x 256, 260 (6th Cir. 2019). This is because claim-splitting requires an *ongoing* duplicative proceeding between the same parties based on the same transaction. *See Katz*, 655 F.3d at 1219 ("[W]ith a dismissal on claim-splitting grounds, by its nature, the dismissed party is involved in another pending suit regarding the same subject matter against the same defendants."); 18 WRIGHT & MILLER, FED. PRAC. & PROC. § 4406 (3d ed. 2016) ("In dealing with *simultaneous* actions on related theories, courts at times express principles of 'claim splitting' that are similar to claim preclusion, but that do not require a prior judgment.") (emphasis added). After all, "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the *same time*." *Curtis*, 226 F.3d at 138–39 (emphasis added). The relevant distinction between res judicata and claim-splitting, at least for this case, is whether the first case reached a final judgement on the merits or whether it is remains ongoing.

But not every instance of duplicative litigation falls into one of these buckets. Sometimes a second lawsuit follows an initial proceeding that was dismissed without prejudice. *See Intera Corp. v. Henderson*, 428 F.3d 605, 620–21 (6th Cir. 2005) (dismissal for lack of jurisdiction is not on the merits). Dismissal without prejudice means "a dismissal without barring the plaintiff from returning later, to the same court, with the same underlying claim." *Arangure v. Whitaker*, 911 F.3d 333, 347 (6th Cir. 2018) (quoting *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001)). A subsequent suit wouldn't be barred by res judicata because no final judgment on the merits ended the first suit. *Id.* ("without prejudice is not truly final"); *Curtis*, 226 F.3d at 138–39 (denying motion to amend based on timeliness is not a decision on the merits that would preclude a separate suit). Nor would a subsequent suit be barred based on claim-splitting because only one suit is ongoing. *Katz*, 655 F.3d at 1219. Such subsequent lawsuits are normal and expected. *See, e.g, Noel v. Guerrero*, 479 F. App'x 666, 669 (6th Cir. 2012). The whole point of dismissing without prejudice is to allow a subsequent suit.

The Board argues that Chabad split its claims by appealing its permit denial to state court before filing this suit. MTD at 3–8. But the Board's own description of the state-court dismissal, supported by its own attached exhibit, shows that the suit was dismissed not on the merits, but instead for lack of jurisdiction because the wrong party was named. *Id.* at 2; State Court Order at 4–5. Since duplicative suits aren't ongoing, claim-splitting doesn't apply. *Katz*, 655 F.3d at 1219. Nor does res judicata, because the dismissal was jurisdictional and thus not on the merits. *Arangure*, 911 F.3d at 347; *Intera Corp.*, 428 F.3d at 620–21. So the motion to dismiss on the basis of claim splitting fails.

### B. Threshold hurdles to federal relief

The Board next tries to limit Chabad's available federal claims based on state sovereign immunity and § 1983's statute of limitations. The Board is incorrect that

4

state sovereign immunity bars these claims, but is largely correct that Chabad filed outside § 1983's statute of limitations.

**1. State sovereign immunity does not apply to the Board.** Historically, under the common law and the law of nations, citizens could not sue a sovereign without consent. *See Franchise Tax Bd. of California v. Hyatt*, 139 S. Ct. 1485, 1494–95 (2019) (citing *Hans v. Louisiana*, 134 U.S. 1, 18 (1890)). The Eleventh Amendment codified this principle with regard to states in certain specified circumstances, while leaving the general background principle of common-law immunity intact. William Baude & Stephen E. Sachs, *The Misunderstood Eleventh Amendment*, 169 U. PA. L. REV. 609, 611–14 (2021). The Board argues that this principle of state sovereign immunity protects it from Chabad's federal claims.

Not so. The Supreme Court has repeatedly made clear that state sovereign immunity doesn't apply to "political subdivisions such as counties and municipalities." *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 400–01 (1979); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). So the "Louisville/Jefferson County Metro Government does not enjoy Eleventh Amendment immunity because it is not considered an entity of the state." *Lea v. Conrad*, No. 3:19-cv-419, 2020 WL 6386396, at *2 (W.D. Ky. Oct. 30, 2020) (quotation omitted). The Board is an arm of the Louisville Metro Government enforcing an ordinance passed by that municipal government. Ordinance No. 132. State sovereign immunity doesn't protect it from Chabad's federal claims.

**2. Section 1983's statute of limitations bars Chabad's federal constitutional claims.** Section 1983 doesn't have an explicit statute of limitations. So courts look to the "statute of limitations governing general personal injury actions" in the state where the injury occurred. *Owens v. Okure*, 488 U.S. 235, 251 (1989). In Kentucky, a one-year statute of limitations generally applies. *Bonner v. Perry*, 564 F.3d 424, 430–31 (6th Cir. 2009) (citing KRS § 413.140(1)(a)). Determining when an injury accrues to begin the limiting period, however, is "governed by federal rules conforming in general to common-law tort principles." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Accrual occurs "when the plaintiff has a complete and present cause of action"—that is, when "the plaintiff can file suit and obtain relief." *Id.* (quotation omitted). Essentially, courts look to "what event should have alerted the typical lay person to protect his or her rights." *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997) (quotation omitted). The Board correctly contends that these federal claims accrued when it denied Chabad's permit. MTD at 5. Chabad is wrong that the injury didn't accrue (or was at least equitably tolled) until it exhausted its administrative remedies, in the form of an appeal to the county circuit court under KRS § 100.347. Response (DN 13) at 4–6.

5

"[E]xhaustion of state remedies," the Supreme Court has made clear, "is not a prerequisite to an action under § 1983." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2167–68 (2019) (quotation omitted) (overruling *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the precedent relied on in Chabad's Response (at 8–9)); *see also Patsy v. Board of Regents of State of Fla.*, 457 U.S. 496, 500–01, 513–16 (1982). So Chabad had a "complete and present cause of action" when the board denied the permit and caused an injury.

As to tolling, federal courts look to state law. *Wallace*, 549 U.S. at 394. Chabad cites no law to support tolling here. And in Kentucky, equitable tolling is quite limited. *See Williams v. Hawkins*, 594 S.W.3d 189, 194 (Ky. 2020). Similarly, the U.S. Supreme Court has found "no support" for the "far-reaching proposition that equitable tolling is appropriate to avoid the risk of concurrent litigation" just because a § 1983 claim is being pursued in state court. *Wallace*, 549 U.S. at 396–97. In fact, "[e]quitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." *Id.* at 396. Because Chabad's cause of action accrued when the Board denied its permit on September 23, 2019, Chabad's suit—filed on November 4, 2020—falls outside the statute of limitations.[2]

---

[2] Chabad didn't argue that its claim remained timely because the Board continued to violate its rights. So any such argument is forfeited. If Chabad had raised it, the Court would've confronted a tricky and unsettled area of the law. A continuing violation occurs, and may extend the limitations period, "if the defendant engages in continuing wrongful conduct," such that "injury to the plaintiff accrues continuously" but could be avoided if the defendant ceased its conduct. *Goldsmith v. Sharrett*, 614 F. App'x 824, 827–28 (6th Cir. 2015). The Sixth Circuit "rarely extends [this rule] to § 1983 actions," however. *Sharpe v. Cureton*, 319 F.3d 259, 266–67 (6th Cir. 2003). Instead, it typically applies in two "narrowly limited" types of Title VII cases: (1) continuing "prior discriminatory activity," such as a hostile work environment, where "the cumulative effect of individual acts" (rather than a single act) created the violation; and (2) "a long-standing and demonstrable policy of discrimination." *Baar v. Jefferson County Bd. of Educ.*, 311 F. App'x 817, 823–24 (6th Cir. 2009) (quotations omitted). The hazy line between a continuing violation by a defendant and a mere lingering effect felt by a plaintiff, *Pitts v. City of Kankakee*, 267 F.3d 592, 595–96 (7th Cir. 2001), has created a serious divide in the courts, Kyle Graham, *The Continuing Violations Doctrine*, 43 GONZ. L. REV. 271, 285–86 (2008).

Chabad alleges it continues to suffer a substantial burden and cannot hold services because the Board can enforce the zoning ordinance against it. Compl. ¶¶ 43, 117, 146–47 (alleging ongoing injury). Does the continued threat posed by an unlawful statute amount to a continuous violation, as the Ninth Circuit has held? *Flynt v. Shimazu*, 940 F.3d 457, 462–63 (9th Cir. 2019) (relying on *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997)); *see also Palmer v. Bd. of Educ. of Comm. Unit Sch. Dist. 201-U*, 46 F.3d 682, 685–686 (7th Cir. 1995) (racially discriminatory school-assignment policy). Or are other circuits right to hold that accrual turns on when a "reasonably prudent plaintiff would have been unable to determine that a violation had occurred"? *Center for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1335 (11th Cir. 2006); *see also Davidson v. America Online, Inc.*,

### C. Chabad fails to state a claim under RLUIPA

RLUIPA prohibits governments from implementing land-use regulations that impose "a substantial burden" on religious exercise or that "trea[t] a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc. Chabad asserts that the Board violated both aspects of the statute, but fails to make out a claim that could support relief under either.

**1. Chabad fails to allege a substantial burden.** "Substantial burden" is not defined by RLUIPA, but courts agree that "land-use regulations can prohibit a plaintiff from engaging in desired religious behaviors." *Livingston Christian Schs. v. Genoa Charter Twp.*, 858 F.3d 996, 1003–04 (6th Cir. 2017). So the burden must be great enough that it "places significant pressure on an institutional plaintiff to modify its behavior." *Id*. The Sixth Circuit considers a non-exclusive list of factors, such as whether the religious entity has a "feasible alternative location," faces "substantial delay, uncertainty, and expense," and whether the "burden was self-imposed." *Id*. at 1004. Whether the "decisionmaking process was arbitrary, capricious, or discriminatory," however, is not relevant to this aspect of RLUIPA. *Id*. at 1004–05.

Chabad's allegations do not implicate any of these factors. And importantly, its burden is at least partially self-imposed. Several circuits have held that a preexisting restriction generally cannot amount to a substantial burden. *See Canaan Christian Church v. Montgomery County*, 29 F.4th 182, 194 (4th Cir. 2022); *Petra Presbyterian Church v. Vill. of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007). The Sixth Circuit hasn't gone that far, but still places quite a bit of weight on whether any burden was self-imposed. *Livingston Christian Schs.*, 858 F.3d at 1004.

To a significant degree, Chabad's burden was self-imposed. It bid on the property two months after the Metro Government enacted an ordinance restricting religious uses in the relevant zone and necessitating the permit whose denial Chabad

---

337 F.3d 1179, 1184 (10th Cir. 1993); *Pitts v. City of Kankakee*, 267 F.3d 592, 595–96 (7th Cir. 2001) (placement of defamatory sign); *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 236–37 (3d Cir. 2014) (placement of religious sign); *Knox v. Davis*, 260 F.3d 1009, 1013–15 (9th Cir. 2001) (denial of attorney-visitation rights). In *Kuhnle Brothers*, the Sixth Circuit—considering a right-to-travel claim, grounded in "substantive Due Process" against a "truck traffic ban"— held that "each day that the invalid resolution remained in effect, it inflicted continuing and accumulating harm," not mere "additional harm from a prior unconstitutional act." 103 F.3d at 522 (quotation omitted). But some courts have given *Kuhnle* a more limited reading. *See, e.g.*, *Bird v. Dep't of Hum. Servs.*, 935 F.3d 738, 744–45 (9th Cir. 2019); *Yetto v. City of Jackson*, No. 117-cv-1205, 2019 WL 454603, at *8–9 (W.D. Tenn. Feb. 5, 2019) (zoning ordinance similar to Prospect's was not facially unconstitutional, as the statute in *Kuhnle* had been, so violation wasn't continuing).

This uncertainty in the law underscores the prudence of treating this unbriefed argument as forfeited. *See generally May v. Warner Amex Cable Commc'ns*, 848 F.2d 192 (6th Cir. 1988) (parties may waive the statute of limitations, which is an affirmative defense).

now complains of. Compl. ¶¶ 30–35; Ordinance 132. Before the ordinance passed, a state official had told Rabbi Susman that the property could be used for religious purposes. ¶¶ 27–28, 35. And Chabad insists it was unaware of the amendment when it bought the house, although ignorance of the law is generally no excuse. *Id.* Chabad argues that the permit denial, not the ordinance, is the source of its burden. Response at 12. This is partially correct. The burden was not fully self-imposed because, while the ordinance made religious use more difficult, a permit was at least possible. *See, e.g.*, *United States v. City of Troy*, No. 19-cv-12736, 2022 WL 831225, at *14 (E.D. Mich. Mar. 18, 2022).

But the Board retained a tremendous amount of discretion to deny a permit. Chabad had to demonstrate that traffic increases could be mitigated, comply with a noise ordinance, and meet parking restrictions. Ordinance 132 at 4. Even then, the Code authorized the Board to deny a permit based on "any other matter that the Board may deem appropriate and relevant to the specific proposal." Land Development Code, 11.5A.1(B)(5). If a permit or variance is reasonably likely, a purchaser could reasonably rely on that possibility even though the ordinance generally restricts the desired use. *City of Troy*, 2022 WL 831225, at *14. But there are no allegations indicating that Chabad reasonably believed it would get a permit. And Chabad's allegations that the denial was discriminatory (discussed below) are not relevant to this substantial-burden claim. *Id.* (considering evidence of other permits and regulations); *Andon, LLC v. City of Newport News*, 813 F.3d 510, 513 (4th Cir. 2016) (applicant knew variance likely to be denied). When Chabad bought the property, therefore, the amended ordinance made it unlikely that Chabad could use it as a synagogue. So this factor weighs against Chabad.

Chabad might have been able to make out a claim if it had pled any of the other factors. But Chabad alleged only that it chose and purchased the property "specifically" to open a synagogue for the community given that there are "[v]ery few synagogues" in the area and having one in "Prospect is vital to its mission." Compl. ¶¶ 66, 91, 202. It didn't allege any delay, expense, and uncertainty due to the burden of the denial. And Chabad never alleged that alternatives are infeasible, nor any other facts that indicate a substantial burden. *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1068 (9th Cir. 2011) (emphasizing the importance of evidence of a lack of alternatives). Without more, it is impossible to conclude that the ordinance created a burden so great as to exempt Chabad from the ordinance by effectively requiring a permit. Aside from the recency of the ordinance's enactment and the advice Chabad had received *before* the amendment, it's hard to distinguish this scenario from that facing any other house of worship seeking to enter an area whose zoning prohibited its presence. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004) (requiring a synagogue to move and its congregants to walk further in order to comply with zoning was not a substantial burden); *Livingston Christian Schs.*, 858 F.3d at 1004 ("[L]and-use regulations can prohibit a plaintiff from engaging in desired religious behaviors ….").

8

**2. Chabad fails to allege an "equal terms" violation.** RLUIPA's equal-terms provision bars governments from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1); *see generally* Sarah Keeton Campbell, Note, *Restoring RLUIPA's Equal Terms Provision*, 58 DUKE. L.J. 1071, 1083–85 (2009). A prima facie case requires proof of the religious group's treatment compared to "a nonreligious assembly or institution" to determine whether the terms facing the religious group were "less than equal." *Tree of Life Christian Schs. v. City of Upper Arlington*, 905 F.3d 357, 367 (6th Cir. 2018) (quoting and adopting *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1307–08 (11th Cir. 2006)).

The difficulty evident in appellate decisions regarding such claims comes from determining "what constitutes a proper comparator" between religious and secular assemblies and institutions. *Tree of Life*, 905 F.3d at 367. A "comparator" is "a nonreligious assembly or institution" courts examine to determine whether the government "treat[ed] a religious assembly or institution on less than equal terms." *Id.* (quoting 42 U.S.C. § 2000cc(b)(1)). The comparator needn't be similar in all relevant aspects, just "similarly situated with regard to legitimate zoning criteria." *Id.* at 368, 370; *but see id.* at 378–79 (Thapar, J., dissenting) (characterizing "similarly situated" as an atextual gloss); *Canaan Christian Church*, 29 F.4th at 201 (Richardson, J., concurring on similar grounds). The plaintiff bears the burden of making out a prima facie case before the burden of persuasion shifts to the government. *Id.* at 370.

Here the ordinance defines "institutional use" to cover schools, government buildings, religious buildings, essential services, parks, and more. Ordinance 132 at 2. The ordinance generally prohibits institutional uses in residential districts like the one at issue here. *Id.* The ordinance makes exceptions for schools, libraries, historical buildings, and parks, however. *Id.* at 2–3. Before the recent amendment, the ordinance also exempted religious buildings. *Id.*; Compl. ¶¶ 27–30. But that is no longer the case; those seeking a non-exempted private institutional use now must seek a Conditional Use Permit. Ordinance 132 at 2, 4.

During Chabad's permit hearing, witnesses mentioned several concerns relevant to the conditional-use determination: traffic, the character of the neighborhood, and property values. Compl. ¶¶ 68, 75, 80, 83, 86, 95–96, 193–194. In general these are legitimate zoning criteria. *See, e.g., River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.*, 611 F.3d 367, 371–72 (7th Cir. 2010) (traffic and safety are reasons to keep residences and commercial areas separate); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood*, 699 F.2d 303, 308 (6th Cir. 1983) (holding similar concerns are legitimate in the First Amendment context). Facially, the ordinance excludes a whole host of "institutional uses" from

residential districts, including religious and secular uses alike. Ordinance 132 at 2–3 (covenants, monasteries, "religious buildings," libraries, colleges, private non-profit clubs, and recreation camps).

An equal-terms violation may rest on a law that (1) treats religious groups less favorably on its face, (2) is gerrymandered to "almost only" affect religious groups even if facially neutral, or (3) is applied unequally. *Primera*, 450 F.3d at 1308–09. But Chabad argues only that the ordinance is unequally applied. *See* Compl. ¶¶ 187–202; Response at 13. And it advances two reasons: (a) regular secular events would raise similar concerns as Chabad's synagogue and (b) the Board's procedures were biased and arbitrary. Response at 13. Unfortunately, Chabad hardly explains these points. *Id.* And based on the complaint, neither is sufficient to show an equal-terms violation.

**a) Secular events.** Chabad compares its impact on traffic with that of birdwatchers and residents hosting "Easter, Christmas, Derby, or birthday gathering[s]," none of which must seek a permit. Compl. ¶¶ 84, 88, 199. The Board argues, without rebuttal, that such actions are not secular assemblies or institutions. Reply at 8–9. Christmas and Easter are not even secular, at least on their face. "Birdwatchers"—as sparely pled here—does not refer to any assembly of people gathered together. That leaves household birthday and Derby parties. Can their existence in neighborhoods all across America really mean that Congress, in enacting RLUIPA, trumped the longstanding authority of local governments to enact any zoning rules addressing religious and other institutions? *See generally Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387–88 (1926) (discussing zoning as part of state police power). Is that the sort of comparison anyone would've understood Congress to have called for when it enacted RLUIPA?

Courts typically have not accepted invitations as bold as this. When a law allows secular gatherings of similar size and frequency as prohibited religious meetings, that can create an unequal-terms problem. In determining similarity, the Eleventh Circuit (in a decision the Sixth Circuit cited approvingly) has considered factors such as the meetings' frequency, traffic impact, openness to the public, and advertising. *See Konikov*, 410 F.3d at 1327–29 (comparing religious organization to Cub Scout meetings and sports watch parties); *Tree of Life*, 905 F.3d at 369–70 (citing *Konikov*, 410 F.3d at 1327). That court held that an ordinance was unequal because the scout meetings and football gatherings, at least as alleged, met with similar frequency as the religious group. *Konikov*, 410 F.3d at 1328–29. This meant the existence of a violation turned on whether "religion is not discussed." *Id.* at 1327–29; *see also Yetto v. City of Jackson*, No. 117-cv-1205, 2019 WL 454603, at *11–13 (W.D. Tenn. Feb. 5, 2019). (Cub Scouts and religious group met with equal frequency and in equal numbers). That obviously wouldn't work.

But here, no allegations indicate that the only thing distinguishing Chabad's services from birdwatching and birthday parties is the discussion of religion. After all, Christmas and Easter gatherings are allegedly allowed. Compl. ¶¶ 84, 88, 199. And nothing suggests that a similar Passover dinner would be impermissible. Chabad is designed to do more: holding services, Shabbat dinners, Hebrew school, adult classes, and holiday events—amounting to multiple meetings a week. Compl. ¶¶ 38–42. But it didn't allege that any of the alleged comparators met as frequently or as formally. Nothing in the pleadings indicates the birders and birthday partiers of Prospect meet every week, with advertising and an all-comers admission policy. *See New Life Ministries v. Charter Twp. of Mt. Morris*, No. 05-cv-74339, 2006 WL 2583254, at *5 (E.D. Mich. Sept. 7, 2006). Indeed, the pleadings and briefs said nothing at all about the frequency or traffic burden of the birthday parties and family gatherings Chabad purportedly resembles. And even groups that meet in equal numbers aren't a proper comparator if they don't gather regularly and openly. *See Yetto*, 2019 WL 454603, at *11–13.

Similarly, Chabad is open to the public and has the potential, and indeed the purpose, to grow. Although it disavows any ambition to become a "mega synagogue," Compl. ¶¶ 40–41, 61–62, its mission remains to provide "spiritual guidance, community outreach and education to inspire *all* Jews" and to "spread the love and teachings of the faith to *all communities* in Louisville," ¶¶ 38, 137 (emphasis added). Chabad openly alleges that "*all are welcome* to experience the activities and services offered." ¶ 62. These are commendable goals, to be sure. But they are not the goals of most birthday parties or family gatherings. And for that reason the law declines to presume an equal burden on traffic, parking, and other neutral considerations traditionally relevant to zoning.

RLUIPA didn't prohibit common sense and good (or even questionable) judgment: those who enact ordinances and make individual zoning decisions can make reasonable predictions. *See Tree of Life*, 905 F.3d at 372–74 (predicting that a commercial area will bring in more tax revenue than religious schools even if the particular office buildings have not done so). Indeed, the responsibility to make "zoning decisions require[s] the regulatory authority to project the effects that a particular land use will have" on traffic, revenue, and any other considerations made relevant by the local laws. *Id*. at 374. And in doing so, the local authority may make generalized determinations even if it "cannot guarantee that its predictions will be borne out." *Id*. at 373. And Chabad hasn't offered anything to rebut the prediction that a house of worship would be more likely to cause greater traffic problems than regular residential events, even if the religious services are currently smaller. *See* Compl. ¶¶ 83–88, 197. Certainly, cases may arise in which the local regulator's reasoning applies equally to an unencumbered secular comparator—and that could indicate unequal treatment. *See Konikov*, 410 F.3d at 1327–29. But the allegations

here don't identify similar secular comparators for traffic, parking, growth, or regularity based on frequency of meetings, openness to the public, and potential for growth.

Moreover, the Board emphasized concerns about property values and the character of the neighborhood. Compl. ¶¶ 75, 80, 83, 86, 95–96, 193–94. While Chabad questions the factual basis for such concerns, it offers no relevant comparators that undermine the Board's position. ¶¶ 50, 70, 96, 105. Gathering to celebrate birthdays, holidays, and sports is expected in residential areas; indeed, that fellowship may add to the value many place on a home. So these essentially residential gatherings are not necessarily comparators for religious and other institutional events. A more compelling comparison would contrast a birthday party and Passover meals. An imbalance in their treatment would certainly suggest a problem, but is not the case here. At most, Chabad speculates that a church could've and perhaps should've received more welcoming treatment. ¶ 90. That is of course possible, but Chabad hasn't offered any factual allegations rendering it plausible or non-speculative. Nor does Chabad's hypothetical church serve as a valid comparator for its equal-terms claim. So Chabad hasn't pled facts undermining the Board's reasons for treating Chabad differently than other dissimilar assemblies.

**b) Discriminatory decisionmaking.** Chabad argues that the Board's procedural irregularities, negative comments, and unreasonable decisionmaking reveal discrimination. Although some circuits consider arbitrary or discriminatory decisionmaking in assessing a substantial-burden claim, the Sixth Circuit has said that it goes instead to a discrimination claim. *Livingston Christian Schs.*, 858 F.3d at 1004–05 (citing 42 U.S.C. § 2000cc(b)(2)); *see also Thai Meditation*, 980 F.3d at 835.[3] It is not clear, based on the papers here, that such evidence has ever been used instead or in addition to show that a government afforded a secular comparator preferable treatment. But Chabad hasn't raised a discrimination claim under RLUIPA. If it did, that would require discriminatory intent, which Chabad hasn't alleged in anything more than a conclusory manner.

Regardless, Chabad's allegations of procedural irregularities and errant comments wouldn't add up to an equal-terms claim. To the extent such factors are ever relevant to an RLUIPA claim, courts have examined "'departures from the

---

[3] The Sixth Circuit in *Livingston Christian Schools* explained that "although several other circuits have taken evidence of alleged discrimination into account in considering whether there was a substantial burden on religious exercise," such evidence "is more appropriately considered when evaluating whether a governmental action was narrowly tailored to serve a compelling state interest—an inquiry that the court should undertake only after finding that a substantial burden exists." 858 F.3d at 1005. RLUIPA, the Court of Appeals noted, "contains a separate prohibition on discrimination in the implementation of land-use regulations," and accounting for discrimination in the substantial-burden analysis would conflate the two types of claims. *Id.* (citing 42 U.S.C. § 2000cc(b)(1)–(2)).

normal' decisionmaking process" and "'legislative or administrative history' in the form of contemporary statements by the decisionmakers." *Thai Meditation*, 980 F.3d at 835 (quoting *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). Chabad alleges that both sides were supposed to receive equal time, yet the chairperson opened the opposition's portion of the hearing by saying "I'm sure you all will run over" and did indeed let them speak longer. Compl. ¶¶ 72–73. This allowed several neighbors to speak in opposition "despite procedural time concerns." ¶ 97. Later, the chairperson told speakers not to make cumulative arguments, but then did nothing when the speakers did just that. ¶¶ 100–103.

These are questions of hearing management that don't necessarily, or even naturally, show discrimination, animus, or unequal terms. A district judge, of all people, should be loath to make a federal case out of discretionary decisions about running proceedings on a day-to-day basis. And the law governing local meetings such as this confirms that intuition. The Board has wide latitude in how it carries out its hearings. *Arnold v. Versailles-Midway-Woodford County Bd. of Adjustment*, No. 2008-ca-1850, 2010 WL 668664, at *3 (Ky. Ct. App. Feb. 26, 2010) (Board free to consider counsel's "decision tree" when setting procedures). Hearings often feature minor irregularities of pacing or timing. This hardly shows an intent to discriminate or any other unequal decisionmaking.

Next, Chabad points to several statements by opposing counsel (not the Board itself) that indicate "disrespect" or "disdain" for Chabad. Compl. ¶¶ 98–99. Chabad asserts that counsel called the neighbors "real property owners" and misrepresented Chabad's intentions. ¶¶ 98–99. But they *are* owners of the "real property" nearby. Chabad also "wonder[s]" whether a Christian church would be treated differently, and argues that this reflects disdain for Chabad. ¶¶ 90–92. But this is conclusory and speculative. A mistaken or even offensive statement by opposing counsel wouldn't necessarily reflect discrimination or unequal treatment by the Board.

In an attempt to impute these statements and inferred beliefs to the Board, Chabad alleges that the chairperson's expressed concerns about the septic tank were pretext, given that a neutral witness from the water company said this was a surmountable problem, ¶¶ 67–68, 106–11, and that another Board member questioned the chairperson's reasoning, ¶ 109. But a factual disagreement is not indicative of discrimination. Nor is the chair's expression, on appeal, that she would not reconsider her decision and doubted others would, either. ¶¶ 114–16. Again, another member seemed to disagree. ¶ 115. It's utterly unsurprising that the Board would decline to quickly change course. This is the stuff of ordinary debate and decisionmaking—not discrimination.

Because none of Chabad's allegations show that the ordinance was applied or permit was denied on unequal or discriminatory terms, this claim fails.[4]

---

[4] Chabad also brings Free Exercise and Establishment Clause claims on the premise that the Board discriminated against or placed a substantial burden on it. Compl. ¶¶ 118–47.

13

### D. State-law limits

Just like with the federal claims, the Board focuses on limits to Chabad's ability to seek redress under state law. The Board initially argued that state-law immunity defeats Chabad's state-law claims, and that KRS § 100.347 is the exclusive state remedy for Board decisions. MTD at 8–9, 14. Because immunity prevents Chabad from recovering damages and the exclusive state-law relief for Board decisions under KRS § 100.347 bars Chabad from receiving a declaration, Chabad's state claims fail.

**1. Immunity under state law limits damages, but not equitable relief.** The Commonwealth of Kentucky is immune from state-law claims absent a waiver or abrogation. *Comair, Inc. v. Lexington-Fayette Urban County Airport Corp.*, 295 S.W. 3d 91, 94 (Ky. 2009); *Dep't of Corrs. v. Furr*, 23 S.W. 3d 615, 616 (Ky. 2000). This immunity extends to county governments, including Louisville's consolidated city-county model. *Bryant v. Louisville Metro Housing Auth.*, 568 S.W. 3d 839, 845 (Ky. 2019). And it often includes agencies engaged in state functions, including the Board. *Id.* at 845–50 (Louisville Metro Housing Authority has immunity); *Franklin-Simpson County Board of Zoning Adjustment*, 603 S.W.3d 687, 692 (Ky. App. 2020) (so does a zoning board). Federal courts must consider immunity under state law when addressing state-law claims. *Shepherd v. Floyd County*, 128 F. Supp. 3d 976, 979–80 (E.D. Ky. 2015) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938)).

As to the Kentucky Religious Freedom Restoration Act, the state supreme court has squarely held that the General Assembly didn't waive the Commonwealth's sovereign immunity from damages by enacting this law. *Ruplinger v. Louisville/Jefferson County Metro Gov't*, 607 S.W.3d 583, 585 (Ky. 2020). Litigants may, however, seek a "declaratory judgment enjoining Louisville/Jefferson County Metro Government." *Id.* KRS § 418.040 states that a "plaintiff may ask for a

---

Even if those claims, which were seemingly raised solely under § 1983, could survive the statute of limitations, they would almost certainly still fail. RLUIPA is more protective against substantial government burdens on religion than the First Amendment as currently interpreted. *See Chabad Lubavitch of Litchfield County, Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 198–99 (2d Cir. 2014); *River of Life Kingdom Ministries*, 611 F.3d at 378–79 (Sykes, J., dissenting) (RLUIPA countered the First Amendment general-applicability standard of *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990)). To be sure, a law is not considered "generally applicable" under *Smith* if it involves unfettered discretion or an asymmetrical secular exception. *See Canaan Christian Church*, 29 F.4th at 203 (Richardson, J., concurring) (citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021)). Precedent casts doubt that Chabad's case could escape *Smith* on either basis, however. *See, e.g., Lakewood*, 699 F.2d at 305, 308 (banning religious worship from residential area for traffic reasons doesn't violate the First amendment, even if individual exceptions were possible for others); *Grosz v. City of Miami Beach*, 721 F.2d 729, 741 (11th Cir. 1983) (similar).

declaration of rights, either alone or with other relief; and the court may make a binding declaration of rights" for "any action in a court of record of this Commonwealth having general jurisdiction wherein it is made to appear that an actual controversy exists." The Kentucky Supreme Court has described this statute as "expansive," "permit[ting] parties involved in a dispute to resolve conflict in a nearly limitless number of situations." *Whitley v. Robertson County*, 406 S.W.3d 11, 18 (Ky. 2013).

As to Chabad's Kentucky Constitution claims, the analysis is similar. There is "no cause of action for money damages" for violations of the Kentucky Constitution. *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 531–37 (Ky. 2011). There the Kentucky Supreme Court addressed claims for damages rather than equitable relief, and did so under a particular statutory provision: "KRS § 446.070 does not create a private right of action for violations of the state constitution because our constitution is not a statute." *Id.* The court's decision likewise declined to impute a *Bivens*-style constitutional tort claim to the text of the state constitution. *Id.* at 536–38.

Based on *St. Luke*, some judicial opinions have broadly suggested that no private right of action exists *at all* for violations of the Kentucky Constitution, regardless of the remedy requested. *See, e.g.*, *Combs v. Breathitt County Fiscal Ct.*, No. 5:16-cv-464, 2017 WL 4287545, at *3 (E.D. Ky. Sept. 27, 2017) (citing *St. Luke Hosp.*, 354 S.W.3d at 531–32, 536–37 and collecting other cases doing the same). But as the Kentucky Court of Appeals has recognized, *St. Luke* "does not foreclose the possibility of declaratory relief for alleged violations of our state Constitution." *Schell v. Young*, 640 S.W.3d 24, 41–42 (Ky. Ct. App. 2021) (declaratory relief available under Kentucky state law for a violation of Section 2 of the Kentucky Constitution). And it went on to recognize that "not even sovereign immunity is a bar to a declaratory judgment action." *Id.* Indeed, the Kentucky Supreme Court has made clear that "a declaratory judgment action is not a claim for damages," so when the question is "the constitutional appropriateness of governmental actions, there can be no immunity." *Commonwealth v. Kentucky Ret. Sys.*, 396 S.W.3d 833, 838–40 (Ky. 2013). And the same is true for injunctive relief. *Beshear v. Haydon Bridge Co.*, 416 S.W.3d 280, 296–97 (Ky. 2013).

So to the extent the Board contends state-law immunity bars Chabad's request for equitable relief under KRFRA and the Kentucky Constitution, that position fails. Those claims are not barred, though damages claims are.

**2. An appeal under KRS § 100.347 is the exclusive remedy for violations of state law by the Board.** Kentucky law specifies what a disappointed party should do to challenge a zoning-board decision on state-law grounds: "Any person or entity claiming to be injured or aggrieved by any final action of the board of adjustment shall appeal from the action to the Circuit Court." KRS § 100.347. The appeal must be timely—that is, "taken within thirty (30) days after the final action

15

of the board." *Id.* And the lack of a timely appeal of a final board action means the decision "shall not be subject to judicial review." *Id.*

The Board argues that the appeal process is the only remedy available to vindicate any state-law violations based on a decision by the Board. Board Reply (DN 15) at 7. Although it acknowledges that other remedies might conceivably be available for federal claims.

Both state and federal law consistently hold that if "a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1675 (2017) (quotation omitted); *Waugh v. Parker*, 584 S.W. 3d 748, 753 (Ky. 2019) (same). The Kentucky Court of Appeals has indicated that KRS § 100.347 applies this principle to Board appeals. *See Warren County Citizens for Managed Growth, Inc. v. Bd. of Comm'rs of City of Bowling Green*, 207 S.W.3d 7, 17 (Ky. Ct. App. 2006) (no declaratory-judgment action for due-process violations because KRS § 100.347 "affords an adequate remedy"); *Lyster v. Woodford County Bd. of Adjustment Members*, No. 2005-CA-1336, 2007 WL 542719, at *5 (Ky. Ct. App. Feb. 23, 2007) ("[W]here an exclusive statutory remedy such as KRS 100.3474 has been provided, an action for declaratory judgment is improper.") (footnote omitted); *Arnold*, 2010 WL 668664, at *4 (same). So Kentucky law limits the remedies available in a challenge to a zoning decision to those available in an appeal to the state circuit court, and has rejected the possibility of a declaratory judgment in parallel with that specified avenue for review.

The Sixth Circuit reached the same conclusion in a very similar case. In *Robbins v. New Cingular Wireless PSC, LLC*, several residents appealed a board decision under KRS § 100.347 permitting an AT&T cell tower in their area. 854 F.3d 315, 321 (6th Cir. 2017). But they named the wrong parties, so the appeal was dismissed for a lack of jurisdiction and the 30 days to appeal lapsed. *Id.* at 320. Then the residents tried to evade that final ruling by filing a tort suit. *Id.* at 321. The Sixth Circuit said no: the only injury was the board's decision, for which KRS § 100.347 "offers plaintiffs an adequate and exclusive remedy (i.e., appeal to a Kentucky court) for grievances related to a planning board's decision." *Id.* Therefore the "court must dismiss any collateral attack that seeks solely to rehash the same complaints." *Id.*; *see also SouthPointe Partners, LLC v. Louisville Metro Gov't*, No. 2019-CA-1784-MR, 2021 WL 1936084, at *7–8 (Ky. Ct. App. May 14, 2021) (no common-law action available because "KRS 100.347 provides for a remedy," albeit "not the remedial or monetary damages" the plaintiff desired (citing *Robbins*, 854 F.3d at 321)).[5]

---

[5] *Springdale Venture, LLC v. US WorldMeds, LLC* held that the federal court could exercise supplemental jurisdiction over state-law claims against a board. 620 F. Supp. 2d 810, 814 (W.D. Ky. 2009). "[W]hile Kentucky law authorizes an aggrieved entity to appeal a final action of the Planning Commission to state court," the court concluded that KRS

16

Here, as in *Robbins*, Chabad appealed the Board decision under KRS § 100.347 in state court, lost on the same procedural grounds (failure to name the proper party), and filed a federal lawsuit rather than refiling within 30 days in state court. (The federal suit, incidentally, was also filed more than 30 days after the dismissal.) Under state law, Chabad could have raised its KRFRA and Kentucky Constitution claims on appeal to the state court. It cannot hope to achieve broader relief here than the state-law process makes available and exclusive for challenges to Board decisions on state-law grounds. *See Robbins*, 854 F.3d at 321 (citing KRS § 100.347). So this Court cannot grant Chabad the equitable relief it requests for the Board's alleged state-law violations. !

## Conclusion

The Court grants the Board's motion to dismiss (DN 12).

Benjamin Beaton, District Judge
United States District Court

August 23, 2022

---

§ 100.347 "does not provide that state courts shall have exclusive jurisdiction over such appeals." *Id.* This is correct in the sense that state law does not control federal courts' subject-matter jurisdiction, but doesn't resolve the separate question regarding the limited remedies available in response to alleged violations of state law.